UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:19-CV-23-TBR

LEONIA SANDERS, *et al.*,                                      PLAINTIFFS

v.

CITY OF PEMBROKE, *et al.*,                                    DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on several motions. First, Defendants Pennyroyal Mental Health Center, Reba Pleasant, and Janet Tolliver ("PMHC Defendants") filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. [DN 105]. Second, Defendants Heather Holland, Lindee Monroe, and Rebecca Perry ("CHFS Defendants") filed a Motion for Summary Judgment on Remaining Claims. [DN 115]. Third, Defendants Rick Burgess, Lincoln Foster, Eddie Frye, and Maureen Leamy filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. [DN 122]. Finally, Defendant Susan Redmond-Vaught filed a Motion to Dismiss for Failure to State a Claim. [DN 124]. Fully briefed, these matters are ripe for adjudication.

For the reasons stated herein, Defendants Pennyroyal Mental Health Center, Reba Pleasant, and Janet Tolliver's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, [DN 105], is GRANTED; Defendants Heather Holland, Lindee Monroe, and Rebecca Perry's Motion for Summary Judgment on Remaining Claims, [DN 115], is DENIED AS MOOT; Defendants Rick Burgess, Lincoln Foster, Eddie Frye, and Maureen Leamy's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, [DN 122], is GRANTED IN PART AND DENIED IN PART; and Defendant Susan Redmond-Vaught's Motion to Dismiss for Failure to State a

Claim, [DN 124], is GRANTED. The Court will enter a separate Order and Judgment contemporaneous to this Memorandum Opinion.

## BACKGROUND

Plaintiff Leonia Sanders lives in Pembroke, Kentucky with her twenty-seven-year-old son, Ronald Sanders. [DN 51 at 771–72]. Mr. Sanders suffers from mental illness and Ms. Sanders worked with the Kentucky Cabinet for Health and Family Services ("CHFS") and Pennyroyal Mental Health Center ("PMHC") to manage her son's care. *Id.* at 772. However, Ms. Sanders claims that these institutions "betrayed her and Ronald, and with the help of county and municipal law enforcement, [] conspired to kidnap her son" by making him a ward of the state. *Id.* The Amended Complaint provides a lengthy and detailed description of the alleged conspiracy which implicates fourteen individuals and agencies in Christian County.

On February 13, 2019, Plaintiffs filed the current action alleging violations of 42 U.S.C. § 1985 and 42 U.S.C. § 1983, as well as defamation, abuse of process, assault, battery, false imprisonment, false arrest, and outrage. [*See* DN 1]. Subsequently, Defendants City of Pembroke, Judy Peterson, and Mark Reid filed a motion to dismiss, which was granted in part and denied in part. [DN 88, 107]. Additionally, the CHFS Defendants filed a partial motion for summary judgment, which was granted. [DN 93, 113]. The CHFS Defendants have filed a second motion for summary judgment as to Plaintiffs' remaining state law claims. [DN 115]. In response to this motion, Plaintiffs withdrew their abuse of process and assault and battery claims against the CHFS Defendants. [DN 121]. Accordingly, the remaining claims against the CHFS Defendants are dismissed and the CHFS Defendants' motion for summary judgment, [DN 115], is DENIED AS MOOT.

There are currently three motions before the Court. Defendants Rick Burgess, Lincoln Foster, Eddie Frye, and Maureen Leamy, as well as the Pennyroyal Defendants filed motions to dismiss, or in the alternative, motions for summary judgment. Plaintiffs responded to these motions pursuant to the summary judgment standard. However, given that no discovery has been conducted in this matter, the Court believes it would be premature to rule on these motions as motions for summary judgment. Accordingly, the Court will analyze the instant motions pursuant to Civil Rule 12(b)(6).

Courts evaluating motions to dismiss are generally limited to consideration of the complaint and any exhibits attached to the complaint. *Father Flanagan's Boys Home v. Donlon*, No. 1:18-CV-644, 2020 WL 1469469, at *4 (S.D. Ohio Mar. 26, 2020). "However, a court may consider certain materials outside of the pleadings without converting the motion to one for summary judgment." *Id.* These materials include "'exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein.'" *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). The Court will limit its analysis according to this standard.

## LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss under Rule 12(b)(6), a party must "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim becomes plausible "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When considering a Rule 12(b)(6) motion to dismiss, the Court must presume all of the factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc.*, 552 F.3d at 434 (citing *Great Lakes Steel,* 716 F.2d at 1105). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted. *Iqbal*, 556 U.S at 679. The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief." *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677–79).

## DISCUSSION

### I.     42 U.S.C. § 1985(3)

First, Plaintiffs claim that Defendants conspired against Mr. and Ms. Sanders in violation of 42 U.S.C. § 1985(3). Plaintiffs allege that the Pennyroyal Defendants, Redmond-Vaught, Frye, Burgess, Foster, and Leamy "entered into an agreement and shared a common plan with the objective of legally incapacitating and physically removing Ronald Sanders from Christian County, effectively kidnapping him, through an abuse of the judicial and social services processes, in violation of Mr. Sanders'" constitutional rights. [DN 51 at 772].

The Sixth Circuit has held that a viable 42 U.S.C. § 1985(3) claim must contain:

> (1) [A] conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which

4

causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994) (citing *Hilliard v. Ferguson,* 30 F.3d 649, 652–53 (5th Cir. 1994)). A plaintiff "must also establish that the conspiracy was motivated by a class-based animus." *Johnson,* 40 F.3d at 839. "A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.,* 32 F.3d 989, 994 (6th Cir. 1994) (quoting *Hicks v. Resolution Trust Corporation,* 970 F.2d 378, 382 (7th Cir. 1992)).

The Sixth Circuit has held that "§ 1985(3) only covers conspiracies against: 1) classes who receive heightened protection under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the purpose of asserting certain fundamental rights.'" *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000) (quoting *Browder v. Tipton*, 630 F.2d 1149 (6th Cir. 1980)). "[T]he Supreme Court has not conferred suspect or quasi-suspect status on statutory classifications covering the disabled." *Id.* (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442 (1985)); *see also Haverstick*, 32 F.3d at 994 (holding that "[n]o existing legal precedent supports the plaintiffs' argument" that § 1985(3) covers discriminatory conspiracies against the disabled). Therefore, claims of disability-based discrimination or animus are not actionable under § 1985(3). *Bartell*, 215 F.3d at 560; *Kuerbitz v. Meisner*, No. 17-2284, 2018 WL 5310762, at *3 (6th Cir. July 11, 2018) ("Although Kuerbitz alleges a disability, § 1985(3) does not cover claims based on disability-based discrimination or animus."); *Diemond v. Michigan Dep't of Corr.*, No. 1:17-CV-928, 2018 WL 1150023, at *7 (W.D. Mich. Mar. 5, 2018), *aff'd*, No. 18-1344, 2018 WL 7890769 (6th Cir. Oct. 31, 2018) ("Plaintiff has no actionable conspiracy claim under § 1985(3), however, because that statute 'does not cover claims based on disability-based discrimination or animus.'").

5

To the extent that Plaintiffs' § 1985(3) claims are based on disability discrimination, they are not actionable and must be dismissed.

The Court will address Plaintiffs' § 1985(3) race-based discrimination claims against each Defendant in turn.

### A.    Pennyroyal Defendants

Plaintiffs describe the Pennyroyal Defendants' alleged involvement in the § 1985(3) conspiracy as follows:

> Tolliver, Pleasant, and PMHC maliciously and falsely alleged that Mrs. Sanders sabotaged and caused turmoil in her son's life, specifically in relation to factual allegations that included her leaving him home unsupervised and taking him off his medications. Such statements were part of a campaign motivated by the sinister objective of negatively influencing Mrs. Sander's petition to be appointed her son's guardian. Tolliver and Pleasant spread lies about Mrs. Sanders' relationship with her son to the providers at WSH, who would then generate medical records based on the fabricated patient history, such that the providers condemned Mrs. Sanders as an unsuitable guardian for Ronald Sanders. Some of the providers unwittingly generated records based on the fabricated patient history provided by Tolliver, Pleasant, and PMHC.

[DN 51 at 802–03].

In their Motion to Dismiss, the Pennyroyal Defendants argue that Plaintiffs' § 1985(3) claim fails because the Amended Complaint "is silent as to the required allegation that the Pennyroyal Defendants treated Mr. and Ms. Sanders less favorably due to their race and further fails to allege that the Pennyroyal Defendants treated similarly situated persons more favorably." [DN 105-1 at 1450]. In response, Plaintiffs merely note that "[t]he personal familiarity of Tolliver and Pleasant with Mr. Sanders proves that they knew Mr. and Mrs. Sanders were African American." [DN 106 at 1476–77]. Thus, Plaintiffs argue, race-based animus was plausibly pleaded in the Amended Complaint. *Id.* at 1477. In reply, Defendants argue that Plaintiffs' claims regarding

discriminatory animus are conclusory and insufficient to preserve a § 1985(3) claim. [DN 109 at 1532].

Plaintiffs have failed to plead sufficient facts indicating that the Pennyroyal Defendants participated in a race-based conspiracy. The mere fact that Pleasant and Tolliver knew the Plaintiffs were African American is conclusory and insufficient to establish that the alleged conspiracy was motivated by class-based animus. Because the Amended Complaint failed to plausibly plead a race-based conspiracy against the Pennyroyal Defendants, such claims must be dismissed.

### B.  Redmond-Vaught

The Amended Complaint alleges Redmond-Vaught's role in the conspiracy involved maliciously and falsely claiming that Ms. Sanders sabotaged and caused turmoil in her son's life, specifically in relation to factual allegations that included her leaving him home unsupervised and taking him off his medications. [DN 51 at 802]. Moreover, Plaintiffs claim that Redmond-Vaught "was in consultation with Leamy, Tolliver, and Pleasant, and shared with them the objective of ensuring that the Cabinet would ultimately be appointed Ronald Sanders's guardian." *Id.* at 803. Furthermore, the Amended Complaint states:

> The WSH reports, both those of Vaught and the unwitting providers to whom Pleasant, Tolliver, and PMHC lied, were filed in the court record as authoritative observations intended to educate and advise the Hopkins District Judge. Vaught went further in promoting these defamatory allegations against Mrs. Sanders by filing two reports, including the "sloppy work" that concealed her authorship, into the disability court record, in which she knowingly published and republished the false allegations about Mrs. Sanders, in promotion of a false patient history that was crafted in consultation and purposeful conformity with the objectives of Pleasant, Tolliver, PMHC, and Leamy, as Vaught's report(s) advised the court that Mrs. Sanders should not be her son's guardian, the manner in which is set forth above in ample particularity.

*Id.*

Among other grounds, Redmond-Vaught argues that Plaintiffs' § 1985(3) claims should be dismissed because "Plaintiffs failed to sufficiently plead a shared discriminatory objective." [DN 124-1 at 1639]. Specifically, Redmond-Vaught notes "there is nothing in the Amended Complaint that gives rise to a reasonable inference that Redmond-Vaught was motivated to harm anyone based on race." *Id.* at 1640. In their response, Plaintiffs appear to concede that they have failed to plead sufficient facts to establish the class-based animus element of a § 1985(3) claim in regard to Redmond-Vaught. [DN 126 at 1684]. The Court agrees. Plaintiffs' § 1985(3) claims against Redmond-Vaught must be dismissed given that the Amended Complaint fails to plead any facts to suggest that Redmond-Vaught was motivated to conspire against Plaintiffs due to their race.

### C.      Frye, Burgess, Foster, and Leamy

Finally, the Amended Complaint alleges Frye, Burgess, Foster, and Leamy participated in a common scheme to incapacitate and remove Mr. Sanders from Christian County in violation of his constitutional rights. [DN 51 at 800]. Specifically, Plaintiffs claim Frye and Burgess "unlawfully arrested, detained, and physically injured Ronald Sanders in furtherance of the conspiracy." *Id.* Moreover, Plaintiffs allege:

> The criminal prosecutions of Ronald Sanders led by Leamy were vindictive, and based on his race and disability. The guardianship proceeding led by Foster and Leamy was vindictive and based on Ronald Sanders' disability. Leamy, Foster, Reid, Frye and Burgess consulted with each other about targeting Ronald for unlawful arrests.

*Id.* at 801.

In their Motion to Dismiss, Defendants argue that Plaintiffs' conspiracy claims must be dismissed as a matter of law because "Plaintiff has failed to show the Defendants entered into any type of agreement to initiate guardianship proceedings against Ronald Sanders because he was 'black and disabled.'" [DN 122 at 1604]. Plaintiffs concede that they failed to plead sufficient facts

to raise a § 1985(3) claim against these Defendants. [DN 125 at 1661]. The Court agrees. The Amended Complaint fails to establish the class-based animus element of a § 1985(3) claim, and therefore, the § 1985(3) claims against Frye, Burgess, Foster, and Leamy must be dismissed.

## II.  42 U.S.C. § 1983 and *Monell* Claims

### A.  Pennyroyal Defendants

Count Two of the Amended Complaint alleges that "Defendants Peterson, Reid, Frye, and Burgess under the color of state law, . . . used excessive force and effected the unreasonable seizure and arrest of Mr. Sanders" on three occasions in violation of 42 U.S.C. § 1983. [DN 51 at 808]. Additionally, Count Two states that Defendants "Holland, Monroe, Perry, Foster, and Leamy, acting under the color of state law . . . violated Mr. Sanders' rights of Procedural Due Process, which directly and proximately caused him to suffer deprivations of liberty, including the aforementioned guardianship hearings and orders, three arrests and criminal prosecutions, and second and third admissions to WSH." *Id.* Notably, Count Two does not allege that the Pennyroyal Defendants were involved in a § 1983 claim. As a result, the Pennyroyal Defendants did not address Plaintiffs' § 1983 claims in their motion to dismiss. [*See* DN 105-1].

In response, Plaintiffs acknowledge that "the Amended Complaint does not explicitly argue that the [Pennyroyal] Defendants engaged in a § 1983 conspiracy." [DN 106 at 1477]. However, Plaintiffs note that "[t]he elements of civil conspiracy for § 1985 and § 1983 overlap, but they differ in that § 1983 requires state action, but does not require discriminatory animus" *Id.* Since Count One alleges the Pennyroyal Defendants participated in § 1985 conspiracy to violate Plaintiffs' due process rights and Mr. Sanders' right to be free from unreasonable seizures, Plaintiffs argue "[s]ilence in the Amended Complaint as to the Defendants' status as private persons or state actors should not preclude the Plaintiffs from pursuing their Fourteenth and Fourth

Amendment claims as a § 1983 conspiracy." *Id.* In reply, the Pennyroyal Defendants argue that a response to a motion is "obviously not the correct procedural manner in which to assert new claims." [DN 109 at 1528].

"It is axiomatic that a plaintiff cannot add new claims to [his or] her complaint in an opposition to a motion to dismiss and, therefore, this claim could be rejected on that ground alone." *Ault v. Medina Med. Inv'rs, LLC*, No. 1:06 CV 1113, 2007 WL 81853, at *3 (N.D. Ohio Jan. 8, 2007). Since the Amended Complaint does not allege that the Pennyroyal Defendants were involved a § 1983 claim, the Court declines to consider the merits of such a claim.

### B.      Frye and Burgess

Count Two of the Amended Complaint alleges that Defendants Frye and Burgess used excessive force and effectuated the unreasonable seizure and arrest of Mr. Sanders on June 26, 2017, October 23, 2017, and February 13, 2018. [DN 51 at 808]. However, in response to Defendants' motion to dismiss, Plaintiffs clarified their claims as follows: (1) Frye effectuated a false arrest on July 26, 2017; and (2) Burgess used excessive force against Mr. Sanders on February 13, 2018. [DN 125 at 1664]. The Court will address each claim in turn.

### i.      Frye

First, Frye argues that the claims stemming from the July 26, 2017 arrest must be dismissed because they are time-barred. [DN 122 at 1605]. He asserts that a one-year statute of limitations governs this claim, and since the complaint was not filed until February 13, 2019, more than a year after the arrest, it should be dismissed. *Id.* In response, Plaintiffs argue that the statute of limitations is tolled by KRS § 413.170 because Mr. Sanders was under a legal disability at the time of the July 26th arrest. [DN 125 at 1664]. Frye replies that "KRS 413.170 has no bearing on the one year statute of limitations provided by the federal case law interpreting a federal statute." [DN 127 at

1695]. Defendant is incorrect. "Congress did not set out a statute of limitations for claims brought under 42 U.S.C. § 1983." *Burnett v. Transit Auth. of Lexington-Fayette Urban Cty. Gov't*, 981 F. Supp. 2d 630, 633 (E.D. Ky. 2013), *aff'd* (July 10, 2014). Instead, "the Supreme Court has directed that 'courts entertaining claims brought under 42 U.S.C. § 1983 should borrow the state statute of limitations for personal injury actions.'" *Id.* (quoting *Owens v. Okure,* 488 U.S. 235, 236, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)). Therefore, Kentucky's one-year statute of limitations governs Plaintiffs' § 1983 claims. *Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 181–82 (6th Cir. 1990).

Moreover, "[j]ust as limitations periods are taken from state law, so are the rules regarding tolling." *Curran v. City of Dearborn*, 957 F. Supp. 2d 877, 883–84 (E.D. Mich. 2013) (citing *Wallace v. Kato*, 549 U.S. 384, 394, 127 S.Ct. 1091 ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitation."); *Hardin v. Straub,* 490 U.S. 536, 539, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989) ("Limitations periods in § 1983 suits are to be determined by reference to the appropriate 'state statute of limitations and the coordinate tolling rules'; New York's legislative choices in this regard were therefore 'binding rules of law.'"); *Fox v. DeSoto,* 489 F.3d 227, 233 (6th Cir. 2007) (dismissing section 1983 claim on the basis of *Wallace* and observing that "[a]bsent some tolling or delay in accrual, all of these claims would be untimely because they were not brought [for] more than two years after the arrest"); *Kucharski v. Leveille,* 526 F.Supp.2d 768, 771 (E.D. Mich. 2007)). Kentucky's relevant tolling statute provides:

> If a person entitled to bring any action ... was, at the time the cause of action accrued ... of unsound mind, the action may be brought within the same number of years after the removal of the disability or death of the person, whichever happens first, allowed to a person without the disability to bring the action after the right accrued.

KRS § 413.170(1).

In order to toll the statute of limitations under KRS § 413.170(1), a plaintiff must be of "such unsound mind as to render [him] incapable of managing [his] own affairs." *Southeastern Ky. Baptist Hosp., Inc. v. Gaylor,* 756 S.W.2d 467, 469 (Ky.1988) (citations omitted). In determining whether the plaintiff is of unsound mind, courts "focus on most heavily on whether the individual was 'capable of comprehending or understanding the subject of [the dispute and] its natural and probable consequences.'" *Jeffries v. Barnes*, No. 2017-CA-001148-MR, 2019 WL 2246060, at *3 (Ky. Ct. App. May 24, 2019), *review denied* (Apr. 22, 2020) (quoting *Stair v. Gilbert*, 209 Ky. 243, 272 S.W. 732, 734 (1925)). This inquiry "places the focus on a person's mental capacity; specifically, . . . [her] mental capacity to take care of her legal affairs in a timely manner." *Id.*

"[W]hether a plaintiff is of unsound mind is a question of fact." *Gray v. Lexington-Fayette Urban Cty. Gov't*, No. CIV.A. 5:13-045-DCR, 2013 WL 3322609, at *7 (E.D. Ky. July 1, 2013) (citing *Gaylor*, 756 S.W.2d at 471). For example, in *Gray v. Lexington-Fayette*, Gray suffered from a stroke and was unable to communicate. *Id.* The district court found that the fact that Gray's mother was appointed as his guardian as a result of his inability to communicate was "the best evidence" that Gray's "stroke rendered him incapable of managing his own affairs." *Id.* Similarly, in *Brown v. Sun Healthcare Group*, the plaintiff suffered from dementia and was appointed a guardian due to her inability to manage her personal and financial affairs. *Brown v. Sun Healthcare Grp., Inc.*, No. 3:08CV-580-S, 2009 WL 2485548, at *1 (W.D. Ky. Aug. 13, 2009). The district court found that the plaintiff was incompetent at the time of the personal injury and remained incompetent during the litigation. *Id.* Moreover, it stated:

> The appointment of a guardian, Martha Brown, did not, under Kentucky law, remove the disability, and the statute of limitations for bringing claims against these defendants was tolled pursuant to KRS 413.170(1) . . . . Therefore, the claims against these defendants were tolled during the time while she was a resident and thereafter. Ms.

12

> Kelly remains incompetent. The statute of limitations did not begin to run any earlier than October 1, 2008, the time of the filing of the action on her behalf, and the commencement of discovery into these claims.

*Id.*

In this case, the Amended Complaint states that Mr. Sanders "suffers from mental illness and is intellectually low-functioning." [DN 51 at 771]. On May 17, 2018, a jury found Mr. Sanders wholly disabled in managing his financial resources, and partially disabled in managing his personal affairs. *Id.* at 798. Furthermore, on May 29, 2018, a state court judge granted Ms. Sanders legal guardianship of her son. *Id.* at 799. The Court finds that Plaintiffs have pleaded sufficient facts to raise a plausible inference that Mr. Sanders was of unsound mind during the alleged false arrest such that he would lack the mental capacity to take care of his legal affairs in a timely manner. Furthermore, caselaw suggests that the appointment of his mother as his legal guardian did not remove this disability. Accordingly, the claims stemming from the July 26th arrest were tolled pursuant to KRS § 413.170(1).

Additionally, Frye argues he is entitled to qualified immunity as to Plaintiffs' false arrest claims. [*See* DN 122 at 1601]. However, this argument is conclusory, and Defendants failed to provide adequate factual and legal support for this argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."). Accordingly, the Court declines to address whether Frye is protected by qualified immunity at this time.

### ii.    Burgess

Next, Plaintiffs claim that Defendant Burgess used excessive force to effectuate the arrest of Mr. Sanders on February 13, 2018. [DN 51 at 808]. According to the Amended Complaint, Mr. and Ms. Sanders arrived at PMHC where they were met by Burgess and another law enforcement officer. *Id.* at 791. Burgess then read the state guardianship order directing the sheriff's office to

transport Mr. Sanders to PMHC in Madisonville. *Id.* Mr. Sanders "cried that the situation was a set-up, and he ran." *Id.* at 792. Burgess and the second deputy chased Mr. Sanders across the Pennyrile Highway "where he was eventually apprehended, under the threat of being tased. His face was on the asphalt and a deputy's knee in his back when he was handcuffed." *Id.* Plaintiffs claim Mr. Sanders suffered a black eye and swollen lip during this incident. [DN 125 at 1667]. Mr. Sanders was later arraigned on charges of second degree fleeing/evading police and resisting arrest. [DN 51 at 792].

In their motion to dismiss, Defendants argue that Burgess is entitled to qualified immunity for his actions during the arrest.[1] In order to survive a motion to dismiss on qualified-immunity grounds, Plaintiffs must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). "The test is whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 562–63 (6th Cir. 2011).

"Although 'insubstantial claims against government officials should be resolved as early in the litigation as possible, preferably prior to broad discovery,' *Johnson*, 790 F.3d at 653, [the Sixth Circuit] also ha[s] cautioned that 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'" *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)).

---

[1] Additionally, Defendants argue they are immune from suit in their official capacity. [DN 122 at 1603]. However, the Amended Complaint was only filed against Frye, Burgess, Foster, and Leamy in their individual capacities. [*See* DN 39 at 405–06].

"Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id.* (citation omitted).

Here, Plaintiffs allege that Burgess violated Mr. Sanders' Fourth Amendment rights by using excessive force during the February 13th arrest. "[Excessive force] claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard ...." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Moreover, "[t]he 'proper application' of the reasonableness test 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kozma v. City of Livonia*, No. 14-12268, 2015 WL 8310401, at *8 (E.D. Mich. Dec. 9, 2015) (quoting *Graham*, 490 U.S. at 396).

In this case, Plaintiffs allege that Burgess used excessive force to arrest Mr. Sanders by forcing him face down on to the asphalt and placing a knee on his back while handcuffing him, causing Mr. Sanders to suffer a black eye and swollen lip. The first *Graham* factor weighs in Plaintiffs' favor. At the time of the arrest, Mr. Sanders was not suspected of committing any crime at all, rather the deputies were attempting to transport Mr. Sanders to a mental health facility. However, the second and third factors tend to weigh in Burgess' favor. Mr. Sanders arguably posed an immediate threat to the safety of the officers and himself as they were chasing Mr. Sanders across a highway. Additionally, Mr. Sanders was actively resisting the officers' attempts to transport him to PHMC.

15

Although the *Graham* factors tend to weigh against Plaintiffs' excessive force claim, the Court also notes that Mr. Sanders is a mentally disabled man, and Burgess would have been aware of this information having read the state court's guardianship order shortly before Mr. Sanders fled. Generally, "officers are required to 'de-escalate the situation and adjust the application of force downward' when confronted with a mentally disabled person." *Kozma*, 2015 WL 8310401, at \*10 (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013)). For example, in *Kozma*, a mentally disabled woman brought an excessive force claim against several law enforcement officers after they "muscled" her to the ground and applied pressure to her back after she was suspected of shoplifting. *Id.* at \*1. Although the woman did resist the officers, the district court found that "given the admittedly minimal threat that the unarmed Kozma posed, the number of officers involved, and the evidence before the officers concerning Kozma's mental disability, there is a genuine issue of material fact concerning whether the officers' reaction . . . was an unreasonable use of force." *Id.* at 10. Similarly, given Mr. Sanders' disability, the circumstances of this case, and the fact that it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity, the Court finds that Plaintiffs have pleaded sufficient facts to raise a plausible inference that Mr. Sanders' Fourth Amendment rights were violated during the February 13th arrest.

As for the second prong of the qualified immunity inquiry, a finding that Burgess' force was unreasonable under these circumstances would support the conclusion that his conduct violated clearly established law. "The Fourth Amendment guarantees the 'right of an unarmed, minimally threatening, and mentally unstable individual to be free from gratuitous violence during an arrest.'" *Kozma*, 2015 WL 8310401, at \*10 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013); *see also Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688

(6th Cir. 2006) ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.")). Additionally, while it is unclear exactly when Burgess placed his knee in Mr. Sanders' back, and whether Mr. Sanders continued to resist arrest after he had been handcuffed, Mr. Sanders had a clearly established right "to be free from being forcibly kneed in the back while not actively resisting arrest and lying on his stomach on the ground not resisting arrest." *Sweatt v. Doxtader*, 986 F. Supp. 2d 886, 898 (E.D. Mich. 2013); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), ("It's also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."); *see also Griffith v. Coburn*, 473 F.3d 650, 659-60 (6th Cir. 2007) (holding that the use of a neck restraint on a mentally ill arrestee who posed no threat "violate [d] a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force"). Reading the Amended Complaint in a light most favorable to Plaintiffs, it is plausible that Burgess' actions violated Mr. Sanders' clearly established constitutional rights. Accordingly, the Court will deny Burgess' motion to dismiss Plaintiffs' excessive force claims at this time.

### C.    Foster and Leamy

Count Two of the Amended Complaint alleges that Defendants Foster and Leamy violated Mr. Sanders' Procedural Due Process rights and his Substantive Due Process right to live with, enjoy the affections of, and be cared for by his mother. [DN 51 at 808]. However, the Amended Complaint is somewhat unclear as to which of Foster and Leamy's actions allegedly resulted in these constitutional violations. In their response to the motion to dismiss, Plaintiffs clarify that the "violation of due process does not lie in the initiation of the disability proceeding," nor do they

dispute that Mr. Sanders was disabled. [DN 125 at 1656]. Rather, Plaintiffs allege that Mr. Sanders' due process rights were violated when (1) Leamy presented inaccurate and misleading information to the trial judge during the emergency guardianship proceeding, and (2) Leamy and Foster failed to provide proper notice of the emergency guardianship hearing to Mr. Sanders. *Id.* Based on the response to the motion to dismiss, it appears that Plaintiffs have abandoned their substantive due process claims in order to focus solely on procedural due process violations.

Defendants argue that Plaintiffs' due process claims should be dismissed because Foster and Leamy are entitled to absolute prosecutorial immunity. [*See* DN 28]. The Sixth Circuit recently provided a concise explanation of absolute immunity in *Hall v. City of Williamsburg*:

> "An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Absolutely protected acts include those "undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State...." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). We have employed a "functional approach" to determine whether a prosecutor is entitled to absolute immunity, looking to "the nature of the function performed, not the identity of the actor who performed it" when assessing whether conduct is prosecutorial, and thus absolutely protected. *Id.* at 269, 113 S.Ct. 2606 (citation omitted).
>
> Absolute immunity protects "only ... actions that are connected with the prosecutor's role in judicial proceedings, not ... every litigation-inducing conduct." *Adams v. Hanson*, 656 F.3d 397, 402 (6th Cir. 2011) (alteration in original) (quoting *Burns v. Reed*, 500 U.S. 478, 494, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)). Absolute immunity is not available to prosecutors when they perform "'investigative' or 'administrative' functions unrelated to judicial proceedings." *Id.* In addition, a prosecutor is not entitled to absolute immunity when he acts as a complaining witness by making sworn statements to the court in support of a criminal complaint. *Kalina v. Fletcher*, 522 U.S. 118, 129-131, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).

*Hall v. City of Williamsburg*, No. 18-5618, 2019 WL 1470951, at *5–6 (6th Cir. Apr. 1, 2019). Ultimately, Foster and Leamy bear the burden of demonstrating that their actions were an "'integral part of the judicial process' or ... [were] 'intimately associated with the judicial process'"

in order to claim absolute immunity. *Wendrow v. Michigan Dep't of Human Servs.*, 534 F. App'x 516, 527 (6th Cir. 2013) (quoting *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010)).

Defendants note three Kentucky statutes in support of their prosecutorial immunity argument. [DN 28 at 229]. First, KRS § 387.530(1) provides: "A petition for a determination of partial disability or disability and the appointment of a limited guardian, [or] guardian, . . . may be filed by any interested person or by an individual needing guardianship . . . ." Second, KRS § 387.510 defines an interested person or entity as "an adult relative or friend of the respondent or ward, an official or representative of a public of private agency, corporation, or association concerned with that person's welfare, or any other person found suitable by the court." Once a petition for guardianship has been filed, KRS § 387.560 states: "it shall be the duty of the county attorney to assist the petitioner, to represent the interest of the Commonwealth, and to assist the court in its inquiry by the presentation of evidence." Foster and Leamy claim they are entitled to immunity because by participating in the guardianship hearing, they "were merely fulfilling their prosecutorial duties and acting in accordance with the aforementioned statutes." [DN 28 at 229]. More specifically, Defendants argue that "[o]nce Plaintiff Ronald Sanders' disability came to the attention of Defendants Lincoln Foster and Maureen Leamy as a result of his criminal cases, it became incumbent upon these Defendants to seek appropriate protection for Plaintiff Ronald Sanders." *Id.*

In response, Plaintiffs argue that Leamy is not entitled to prosecutorial immunity for presenting inaccurate and misleading allegations of imminent harm to the state court judge because in doing so, she was acting as a witness, not a prosecutor. [DN 125 at 1660]. In support of their argument, Plaintiffs rely on *Kalina v. Fletcher*, 522 U.S. 118 (1997). This case arose in King County, Washington, where state law required prosecutors to initiate criminal proceedings by

filing three documents: (1) an information charging the individual with a crime; (2) a motion for

an arrest warrant; and (3) sworn testimony establishing the grounds for issuing the arrest warrant.

*Id.* at 121. In this case, the prosecutor sought charges against the respondent for burglary. *Id.* She

submitted the information, an arrest warrant, and a Certification for Determination of Probable

Cause in which she personally vouched for the truth of the facts set forth in the certification. *Id.*

However, the certification contained two inaccurate factual statements regarding the evidence in

support of the charges. *Id.* Later, the charges were dropped, and the respondent brought a § 1983

action against the prosecutor. *Id.*

The Supreme Court has categorically held that "acts undertaken by a prosecutor in

preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his

role as an advocate for the State, are entitled to the protections of absolute immunity." *Id.* at 126.

Here, the prosecutor claimed she was entitled to prosecutorial immunity because executing the

sworn certification "was just one incident in a presentation that, viewed as a whole, was the work

of an advocate and was integral to the initiation of the prosecution." *Id.* at 130. However, the

Supreme Court disagreed, finding:

> That characterization is appropriate for her drafting of the certification, her
> determination that the evidence was sufficiently strong to justify a probable-cause
> finding, her decision to file charges, and her presentation of the information and the
> motion to the court. Each of those matters involved the exercise of professional
> judgment; indeed, even the selection of the particular facts to include in the certification
> to provide the evidentiary support for the finding of probable cause required the exercise
> of the judgment of the advocate. But that judgment could not affect the truth or falsity
> of the factual statements themselves. Testifying about facts is the function of the
> witness, not of the lawyer. No matter how brief or succinct it may be, the evidentiary
> component of an application for an arrest warrant is a distinct and essential predicate
> for a finding of probable cause. Even when the person who makes the constitutionally
> required "Oath or affirmation" is a lawyer, the only function that she performs in giving
> sworn testimony is that of a witness.

*Id.* at 130–31.

In the instant case, Plaintiffs allege that Leamy acted as witness in two instances during the emergency guardianship proceeding. First, Leamy initiated the guardianship proceeding by filing a Petition to Determine if Disabled, Application for Appointment of Fiduciary for Disabled Persons, and a supporting affidavit. [DN 125 at 1660]. According to the Amended Complaint:

> Maureen Leamy signed an affidavit in support of her sworn belief that Ronald Sanders was in imminent harm, or a danger or a threat of danger to himself or others. This affidavit, however, cited no factual allegations in support of such harm, danger, or threat of danger. Leamy did recount her "occasion[s] to prosecute" Mr. Sanders and the young man's inability to comply with law enforcement's warnings to keep away from Ms. Edward's property, specifically his alleged propensity to commit the offense of trespassing. Instead, the professed basis of her personal knowledge was restricted to communications with PMHC staff and her limited, adversarial experiences with Ronald Sanders' "inability to adapt his behavior to the law."

[DN 51 at 786–87].

Second, Plaintiffs allege that Leamy acted as witness during the guardianship proceeding by taking the stand and testifying to the following information:

> Mr. Sanders' mental illness and intellectual disability had caused him to have criminal charges taken out against him, that his mother does not supervise him, that "he goes places he's not supposed to be," that he "does things all sorts of things that he's not supposed to"; that "because of his intellectual disability," Leamy has a list of charges that "people want me to take against him," specifically alluding to video footage of Ronald Sanders on Ms. Edwards' property. She also testified that from what Chief Reid had told her, Mrs. Sanders does not supervise her son. Leamy confirmed that she was actively prosecuting Mr. Sanders in criminal district court, and that the emergency appointment is necessary to avoid future criminal charges.

*Id.* at 790.

Assuming the facts in the Amended Complaint are true, Plaintiffs have demonstrated that Leamy testified to specific facts during the emergency guardianship proceeding. First, like the prosecutor in *Kalina*, Leamy submitted a sworn affidavit to the state court testifying to the truth of factual statements in support of her belief that Mr. Sanders was a danger to himself or others in order to initiate a judicial proceeding. In doing so, Leamy acted as a complaining witness.

21

As for Leamy's decision to testify at the emergency guardianship hearing, the Court was unable to identify any similar § 1983 cases in which a prosecutor took the stand as a witness. Presumably, this is due to professional conduct rules which generally prohibit lawyers from acting as witnesses. *See* Kentucky Rule of Professional Conduct 3.7. Indeed, the Supreme Court stated in *Kalina*, "tradition, as well as the ethics of our profession, generally instruct counsel to avoid the risks associated with participating as both advocate and witness in the same proceeding." *Kalina*, 522 U.S. at 130. That said, the Court finds that taking the stand and testifying to the truth of facts during a judicial proceeding constitutes the act of a witness, not an advocate.

Plaintiffs have pleaded sufficient facts to demonstrate that Leamy testified to facts in filing the affidavit and taking the witness stand during the emergency guardianship proceeding, and thus, was functioning as a witness, and not a lawyer. Defendants have offered no rebuttal to Plaintiffs' argument that Leamy was acting as a witness in regard to the emergency guardianship proceeding. As such, Defendants have failed to meet their burden of demonstrating that Leamy is entitled to absolute prosecutorial immunity for her testimony during the emergency guardianship proceeding. Defendants' motion to dismiss this aspect of Plaintiffs' § 1983 claim is denied.

Next, the Court will consider whether Leamy and Foster are entitled to absolute immunity for their alleged failure to notify Mr. Sanders of the emergency guardianship proceedings in violation of his procedural due process rights. In their motion to dismiss, Defendants acknowledge that "[p]rosecutors shed their absolute immunity when they step outside of their prosecutorial duties and assume other roles, such as when they perform administrative or investigative activities." [DN 28 at 231]. However, Defendants argue that issuing a summons is the responsibility of the clerk of court. *Id.* Thus, they argue, Leamy and Foster "failed to engage in behavior that would have been outside their prosecutorial duties" and are therefore protected by

absolute immunity. *Id.* In response, Plaintiffs acknowledges that the clerk is responsible for issuing the summons. [DN 125 at 1659]. However, they argue that Kentucky Rule of Civil Procedure 4.01(1)(a) required Leamy to instruct the clerk by what method and to what address to send the summons. *Id.* Plaintiffs allege that Leamy failed to instruct the clerk, and as a result, Mr. Sanders was not notified of the proceeding. *Id.*

After reviewing the parties' arguments and relevant case law, the Court has determined that additional briefing is necessary in order to properly evaluate Defendants' motion to dismiss. The Court asks the parties to focus their supplemental briefing on two questions: does Kentucky Rule of Civil Procedure 4.01 apply to emergency guardianship proceedings; and if so, would the prosecutors' instructions to the clerk pursuant to Rule 4.01 constitute an administrative prosecutorial function.

## III.    Defamation

### A.    Pennyroyal Defendants

Count Four of the Amended Complaint alleges that the Pennyroyal Defendants made intentional, malicious, and false written and spoken statements which caused harm to Ms. Sanders' reputation and, therefore, constituted defamation and defamation *per se*. [DN 51 at 810–11]. Specifically, Plaintiffs claim:

> The Defendants, Vaught, Tolliver, Pleasant, and PMHC maliciously and falsely alleged that Mrs. Sanders sabotaged and caused turmoil in her son's life, specifically in relation to factual allegations that included her leaving him home unsupervised and taking him off his medications. Not only do these statements tend to disgrace and degrade Mrs. Sanders, hold her up to public hatred, contempt, and ridicule, but they were motivated by the objective of negatively influencing Mrs. Sander's petition to be appointed her son's guardian. Specifically, Tolliver and Pleasant spread lies about Mrs. Sanders' relationship with her son to the providers at WSH, who would then generate medical records based on the fabricated patient history, such that the providers condemned Mrs. Sanders as an unsuitable guardian for Ronald Sanders. Those medical reports were filed in the court record as authoritative observations intended to educate and advise the court.

*Id.*

Under Kentucky law, a prima facie case for defamation requires proof of "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014), *as corrected* (Apr. 7, 2015) (quoting Restatement (Second) of Torts § 558 (1977)).

Yet in certain circumstances, otherwise defamatory statements "are allowed because the societal interest in the unrestricted flow of communication is greater than the private interest." *Id.* Specifically, the Kentucky Supreme Court has "recognized a privilege for individuals communicating 'where the communication is one in which the party has an interest and it is made to another having a corresponding interest.'" *Id.* (quoting *Stringer*, 151 S.W.3d at 795). However, this privilege is not absolute:

> The privilege may be abused and its protection lost by [1] the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; [2] by the publication of the defamatory matter for some improper purpose; [3] by excessive publication; or [4] by the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged.

*Harstad v. Whiteman*, 338 S.W.3d 804, 812 (Ky. Ct. App. 2011) (quoting Restatement (Second) of Torts § 596 cmt. a (1977) (citing §§ 600-605A)).

In their motion to dismiss, Defendants argue that the Amended Complaint fails to establish the elements of a defamation claim. [DN 105-1 at 1459]. First, Kentucky courts hold that language is defamatory "if it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or (3) injure him in his business or occupation." *McCall v. Courier–Journal and Louisville Times Co.,* 623 S.W.2d 882, 884 (Ky.1981); *Stringer v. Wal–Mart Stores, Inc.,* 151 S.W.3d 781, 793 (Ky. 2004) ("Defamatory language is broadly construed as language

that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.") (citations and punctuation omitted). An allegation that the mother of a mentally disabled person would intentionally sabotage her child's life by taking him off his medications would be detrimental to the mother's general reputation in the community and could subject her to public contempt and ridicule. Therefore, Plaintiffs have sufficiently pled that Tolliver and Pleasant's statements were defamatory.

Next, Defendants argue that Tolliver and Pleasant's statements did not constitute publication as required by law. [DN 105-1 at 1460]. Defamatory language is "'published' when it is intentionally or negligently communicated to someone other than the party defamed." *Stringer*, 151 S.W.3d at 794 (quoting RESTATEMENT (SECOND) OF TORTS § 577 (1977)). The Amended Complaint alleges that Tolliver and Pleasant intentionally made false statements regarding Ms. Sanders' relationship with her son to medical professionals at WSH. Therefore, Plaintiffs have alleged sufficient facts to satisfy the publication element of their defamation claim.

Additionally, Defendants allege that Plaintiffs failed "to demonstrate the required third and fourth requirements of a defamation action as they cannot establish any negligence or malice on behalf of the medical professionals at Western State Hospital (who purportedly "published" the defamatory information) nor can they prove special harm to Ms. Sanders, as she ultimately was appointed Mr. Sanders' guardian." [DN 105-1 at 1460]. First, the Court notes that Plaintiffs have not filed a defamation claim against any WSH professionals. Therefore, Plaintiffs are not required to show that such individuals negligently or maliciously published the defamatory information. Moreover, Plaintiffs have sufficiently alleged that Tolliver and Pleasant maliciously made false statements about Ms. Sanders in order to negatively influence Ms. Sanders' guardianship petition.

Finally, in order to survive the motion to dismiss, Plaintiffs must have plausibly pleaded facts demonstrating the actionability of Tolliver and Pleasant's statements irrespective of special harm or the existence of special harm caused by the publication. Kentucky differentiates between two types of actionable language: language which is actionable *per se*, and language which is actionable *per quod. Stringer,* 151 S.W.3d at 794, *overruled in part by Toler*, 458 S.W.3d 276; *accord CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995), *appeal dismissed*, 95 F.3d 1168, 1996 WL 490647 (Fed. Cir. 1996) (unpublished table decision). In a defamation *per se* action, the statement is "actionable on [its] face—without proof of extrinsic facts or explicatory circumstances." *Stringer*, 151 S.W.3d at 794 (quoting David A. Elder, *Kentucky Tort Law: Defamation and the Right of Privacy* § 1.06 (1983)). Statements of that sort include "those which attribute to someone a criminal offense, a loathsome disease, serious sexual misconduct, or conduct which is incompatible with his business, trade, profession, or office." *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006) (citing Restatement (Second) of Torts § 570 (Am. Law Inst. 1977)).

In response to Defendants' motion to dismiss, Plaintiffs argue that Tolliver and Pleasant's statements "tends to damage Mrs. Sanders' reputation and is actionable in and of itself, without a showing of special damages, because it directly implies that she committed child abuse or neglect by depriving her severely intellectually disabled, bipolar, schizophrenic son his needed medication." [DN 106 at 1487]. Although not specifically articulated, this argument appears to suggest that Tolliver and Pleasant's statements constituted defamation *per se* because they "attribute to someone a criminal offense." *Gilliam*, 215 S.W.3d at 61. However, Plaintiffs did not allege that Tolliver and Pleasant's statements implied that Ms. Sanders committed criminal abuse. Moreover, Plaintiffs have provided no authority to suggest that an allegation of child abuse or

neglect is sufficiently damaging to constitute defamation *per se*. Even if that were the case, Kentucky child abuse statutes define a "child" as "any person who has not reached his or her eighteenth birthday." KRS § 600.020. Given that Mr. Sanders was in his twenties and Ms. Sanders had not yet been appointed his guardian, there appears to be no basis to conclude that Ms. Sanders could have been held responsible for child abuse or neglect. Therefore, the Court finds that Plaintiffs have failed to plead sufficient facts to plausibly state a claim for defamation *per se*. The Pennyroyal Defendants' motion to dismiss this claim is granted.

### B.      Redmond-Vaught

Count Four of the Amended Complaint alleges that Redmond-Vaught defamed Plaintiffs by "maliciously and falsely alleg[ing] that Mrs. Sanders sabotaged and caused turmoil in her son's life, specifically in relation to factual allegations that included her leaving him home unsupervised and taking him off his medications." [DN 51 at 811]. In her motion to dismiss, Redmond-Vaught argues that the defamation claim fails because there is no evidence of a defamatory statement published by Redmond-Vaught, or alternatively, Redmond-Vaught's statements are not actionable because they are privileged. [DN 124-1 at 1642–43]. In response, Plaintiffs appear to withdraw their defamation claim against Redmond-Vaught. [DN 126 at 1684]. Accordingly, the defamation claim against Redmond-Vaught is dismissed.

## IV.    Abuse of Process

### A.      Leamy

Count Four of the Amended Complaint alleges that Leamy and others committed abuse of process under Kentucky law when "motivated by an ulterior purpose, [they] willfully engaged in the use of a legal proceeding that was improper to the regular course of the proceeding, during their petition against Ronald Sanders for emergency guardianship." [DN 51 at 811–12].

Broadly speaking, abuse of process is "the irregular or wrongful employment of a judicial proceeding." *Stoll Oil Refining v. Pierce*, 337 S.W.2d 263, 266 (Ky. 1960). The essential elements of an abuse of process claim under Kentucky law are "(1) an ulterior purpose and (2) a willful act in the use of process not proper in the regular conduct of the proceeding." *Garcia v. Whitaker*, 400 S.W.3d 270, 276 (Ky. 2013). To succeed, the plaintiff must show that the defendant engaged in "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citing W. Prosser, *Handbook of the Law of Torts* § 121 (4th ed. 1971)). Conversely, "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Id.* at 394–95.

An ulterior purpose has been characterized as "[t]he crux of an abuse of process action." *Bourbon Cnty. Joint Planning Comm'n v. Simpson*, 799 S.W.2d 42, 45 (Ky. Ct. App. 1990). For instance, in *Garcia*, an attorney disputed the hefty bill his mechanic charged him for repairs to his Porsche. *Garcia*, 400 S.W.3d at 272-73. After the attorney, Whitaker, refused to pay, the mechanic, Garcia, refused to hand over the Porsche. *Id.* at 273. Whitaker then obtained a warrant for Garcia's arrest for failure to make required disposition of property, and accompanied the deputy sheriff to Garcia's home when he served the warrant. *Id.* Upon questioning by the deputy, Garcia admitted that he had hidden Whitaker's car in a neighbor's garage. *Id.* The criminal charges were eventually dismissed, and Garcia filed suit against Whitaker for abuse of process. *Id.* Overturning a directed verdict in Whitaker's favor, the Kentucky Supreme Court found that "a jury could have determined that Whitaker harbored an ulterior purpose—that purpose being to use the criminal complaint and resulting arrest to obtain his vehicle without compensating Garcia." *Id.* at 277.

In another case, *Sprint Communications Co., L.P. v. Leggett*, 307 S.W.3d 109, 111 (Ky. 2010), a telecommunications provider sought to acquire a certain parcel of land belonging to Leggett, the plaintiff, in order to expand and upgrade one of its facilities. When Leggett refused to sell, Sprint initiated condemnation proceedings, as it has previously threatened to do, and Leggett counterclaimed for abuse of process. *Id.* at 111–12. The Kentucky Supreme Court held that the trial court erred in granting Sprint summary judgment, noting that "even a cursory reading of the [applicable] statute reveals that Sprint had no authority to take for its permanent use the entirety of Leggett's land." *Id.* at 115. Sprint's attempt to use legal process to acquire fee simple title to Leggett's land was "a purpose for which a condemnation action ... is not authorized," thus allowing Leggett's claim to go to a jury. *Id.* at 116.

As to the second element, Kentucky courts look for "'a willful act ... not proper in the regular conduct of the proceeding,' used as a 'form of coercion to obtain a collateral advantage.'" *Id.* at 117 (quoting *Simpson*, 962 S.W.2d at 395). The act may occur either before or after process is issued. *Id.* at 118. In *Garcia*, the defendant engaged in a willful, coercive act when he "accompan[ied] the arresting deputy sheriff and detective to Garcia's home in perfecting the arrest and obtaining his Porsche." *Garcia*, 400 S.W.3d at 277. Likewise, in *Leggett*, Sprint threatened legal action in an attempt to achieve a result not authorized by law. *Leggett*, 307 S.W.3d at 119. Conversely, in *Mullins v. Richards*, 705 S.W.2d 951, 952 (Ky. Ct. App. 1986), the Court of Appeals found no liability for abuse of process when the defendants never attempted to use their ill-founded indictments against the plaintiff.

Although not explicitly stated in the context of the abuse of process claim, the Amended Complaint alleges that Leamy was motivated to initiate the emergency guardianship proceeding because she was frustrated that she would not be able to convict Mr. Sanders of a crime due to his

incompetency to stand trial. [DN 51 at 801]. Assuming, without deciding, that is a sufficient motive to establish the ulterior purpose element, Plaintiffs' abuse of process claim still fails because the Amended Complaint does not allege that Leamy took some "willful act" as a "form of coercion to obtain a collateral advantage." *Leggett*, 307 S.W.3d at 117. In the typical abuse of process claim, the plaintiff satisfies the willful act element by showing that the defendant directly bargained with him, using the wrongful process as leverage. *See, e.g., Garcia*, 400 S.W.3d at 277; *Leggett*, 307 S.W.3d at 119; *Flynn*, 399 S.W.2d at 494 (defendants used arrest warrant to convince plaintiff to release wage garnishment); *Isham v. ABF Freight Sys., Inc.*, Nos. 2004-CA-001349-MR, 2005-CA-000409-MR, 2006 WL 2641398, at *10 (Ky. Ct. App. Sept. 15, 2006) (employer used criminal charge as leverage to obtain employee's resignation). Here, Plaintiffs have pled no facts indicating that Leamy took any sort of willful action not proper in the regular course of the proceeding against Mr. Sanders in order to gain a collateral advantage. For instance, there are no facts to suggest Leamy had any contact with the Sanders between the filing of the petition and the disability hearing, nor did she offer to drop the petition if Mr. Sanders agreed to take certain actions in his criminal proceedings. *See Mullins*, 705 S.W.2d at 952. Accordingly, Plaintiffs failed to plead facts which raise a plausible inference that Leamy abused the guardianship process and this claim must be dismissed.

## V.     Assault, Battery, False Imprisonment, and False Arrest

### A.     Assault and Battery

Count Four of the Amended Complaint alleges that Defendants Frye and Burgess committed assault and battery under Kentucky law. [DN 812]. Under Kentucky law, one is liable for assault if "he acts intending to cause a harmful or offensive contact ... or an imminent apprehension of such a contact, and the other is put in such imminent apprehension." *Restatement*

*(Second) of Torts* § 21. A battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Sigler v. Ralph,* 417 S.W.2d 239, 241 (Ky. 1967). "However, a police officer is privileged, under certain circumstances, to use force in effecting an arrest." *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922–23 (E.D. Ky. 2008*), as amended* (Dec. 4, 2008). This privilege has been codified as follows:

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant, acting under official authority, is making or assisting in making an arrest, and he:
>
>> (a) Believes that such force is necessary to effect the arrest;
>
>> (b) Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and
>
>> (c) Believes the arrest to be lawful.

KRS § 503.090. "Although the state statutes referred to are justifications in defense of criminal charges for use of physical force, the same principles apply to Plaintiffs' state law claim of civil assault and battery." *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003).

Here, the Court has already determined that Plaintiffs have pled sufficient facts to raise a plausible claim that Burgess used more force than necessary to effectuate the arrest on February 13, 2018. Therefore, Plaintiffs' state law assault and battery claims against Burgess may continue at this time. However, the Amended Complaint failed to allege that Frye made any harmful or offensive contact with any person, or the imminent apprehension of such a harmful or offensive contact. Therefore, Plaintiffs' assault and battery claims against Frye are dismissed for failure to state a claim.

### B.    False Arrest and False Imprisonment

Additionally, Plaintiffs allege that Frye and Burgess falsely arrested and falsely imprisoned Mr. Sanders. [DN 51 at 812]. "There is no distinction between claims of false arrest and false

imprisonment under Kentucky law." *Martin v. Coyt,* No. 1:10-CV-00176-R, 2012 WL 1574823, at *16 (W.D. Ky. May 3, 2012) (citing *Lexington–Fayette Urban County Government v. Middleton,* 555 S.W.2d 613, 619 (1977)). Kentucky cases define false imprisonment as being any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats or otherwise. Furthermore, false imprisonment requires that the restraint be wrongful, improper, or without a claim of reasonable justification, authority or privilege." *Banks v. Fritsch,* 39 S.W.3d 474, 479 (Ky. Ct. App. 2001) (citing *Grayson Variety Store, Inc. v. Shaffer,* 402 S.W.2d 424 (Ky. 1960); *Great Atl. & Pac. Tea Co. v. Billups,* 69 S.W.2d 5 (Ky. 1934); *Ford Motor Credit Co. v. Gibson,* 566 S.W.2d 154 (Ky. Ct. App. 1977); *J.J. Newberry Co. v. Judd,* 82 S.W.2d 359 (Ky. 1935); *Louisville & Nashville R.R. Co. v. Mason,* 251 S.W. 184 (Ky. 1923)).

In Kentucky, a law enforcement officer is "liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual." *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007). "Two common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it." *Id.* (citation omitted). "The common element of both examples is that the detention was lawful as it occurred pursuant to legal process." *Id.* In this case, Judge Cotthoff entered an order authorizing the sheriff to transport Mr. Sanders to PMHC in Madisonville. Thus, Burgess was authorized pursuant to legal process to detain Mr. Sanders on February 13, 2018. Therefore, Plaintiffs fail to state a claim for false arrest against Burgess.

As for Frye, Defendants argue that the false arrest claim fails because "Deputy Frye had probable cause, even if he didn't have probable cause the arrest and charges in July are too

attenuated from the crux of the Plaintiff's amended Complaint, the guardianship proceeding." [DN 122 at 1609]. Defendants argument is conclusory. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted). The Amended Complaint alleges that Frye arrested Mr. Sanders for Disorderly Conduct and Alcohol Intoxication despite the fact that his blood alcohol level was below the legal limit of presumed intoxication and at no time during the encounter was Mr. Sanders disruptive. [DN 51 at 778–79]. Taking the Amended Complaint as true, Plaintiffs have pleaded sufficient facts to raise a plausible inference that Frye arrested Mr. Sanders without probable cause. Therefore, the motion to dismiss this claim is denied.

## VI.   Outrage

Finally, the Plaintiffs allege that all the Defendants committed the tort of outrage. [DN 51 at 812]. Specifically, the Amended Complaint states: "The conduct [of] the Defendants was so atrocious and intolerable that it exemplifies the tort of outrage. The Defendants' conduct was the substantial factor and direct and proximate cause of the Plaintiffs' injuries, for which they are entitled to recover actual, compensatory, and punitive damages." *Id.* at 813.

Pursuant to Kentucky law, a prima facie case of outrage requires that a plaintiff show: (1) that the wrongdoer's conduct was intentional or reckless; (2) that the conduct was outrageous and intolerable and offends against the generally accepted standards of decency and morality; (3) a causal connection between the wrongdoer's conduct and the emotional distress; and (4) that the emotional distress was severe. *Stringer*, 151 S.W.3d at 788 (*citing Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990)). Courts have "set a high threshold for outrage claims." *Id.* at 791. "[A] claim for the tort of outrage requires the plaintiff to prove conduct which is 'so outrageous in

33

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Marshall v. Rawlings Co., LLC*, No. 3:14-CV-00359, 2014 WL 4542426, at *3 (W.D. Ky. Sept. 11, 2014) (quoting *Humana*, 796 S.W.2d at 3 (quoting Restatement (Second) of Torts § 46(1) cmt. d (1965))).

The Court "make[s] the initial determination whether the conduct complained of can reasonably be regarded as so extreme and outrageous as to permit recovery." *Whittington v. Whittington*, 766 S.W.2d 73 (Ky. Ct. App. 1989). For example, Kentucky courts have found plaintiffs' proof of outrageous conduct sufficient to support an outrage claim in cases where the defendants:

> (1) harassed the plaintiff "by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic"; (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; (3) engaged in "a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring [plaintiff] to his knees"; (4) committed same-sex sexual harassment in the form of "frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex", (5) was a Catholic priest who "used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife"; (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter; and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.

*Stringer*, 151 S.W.3d at 789–90 (internal citations omitted).

### A.     Pennyroyal Defendants

The Pennyroyal Defendants argue that Plaintiffs' outrage claim must be dismissed because it is a "vague claim" "not specific to any named defendant and therefore fails under the analysis set forth under *Iqual/Twombly*." [DN 105-1 at 1462]. In response, Plaintiffs clarified that their outrage claim against the Pennyroyal Defendants focuses on Tolliver and Pleasant's alleged refusal to allow Ms. Sanders to visit Mr. Sanders while he was housed at PMHC Madisonville pending

his disability hearing. Even assuming the truth of these allegations, the Court concludes that the Pennyroyal Defendants' conduct was not so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. It follows that the Pennyroyal Defendants' alleged conduct is not sufficiently extreme to sustain an outrage claim under Kentucky law.

### B.    Redmond-Vaught

Defendant Redmond-Vaught argues that Plaintiffs have failed to sufficiently plead an outrage claim, and even if true, Redmond-Vaught's alleged conduct does not approach the high standard for outrage claims. [DN 124-1 at 1645-46]. Plaintiffs did not address the outrage claim in their response. Therefore, the Court considers it conceded by Plaintiffs and Redmond-Vaught's motion to dismiss the defamation claim is granted. *See Ctr. for Biological Diversity v. Rural Utils. Serv.,* 2009 WL 3241607, at *3 (E.D. Ky. Oct. 2, 2009) ("When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of response is grounds for the district court to assume opposition to the motion is waived, and grant the motion.") (citing *Humphrey v. U.S. Attorney General's Office,* 279 F. App'x 328, 331 (6th Cir. 2008)).

### C.    Frye, Burgess, Foster, and Leamy

Finally, Defendants Frye, Burgess, Foster, and Leamy argue that Plaintiffs' outrage claim must be dismissed because it is generic and offers "nothing more than a mere allegation of emotional distress." [DN 122 at 1610]. Plaintiffs did not address the outrage claim in their response. Accordingly, the Court considers it conceded by Plaintiffs and Defendants' motion to dismiss the defamation claim is granted. *See Ctr. for Biological Diversity v. Rural Utils. Serv.,* 2009 WL 3241607, at *3 (E.D. Ky. Oct. 2, 2009).

### CONCLUSION

For the reasons stated herein, Defendants Pennyroyal Mental Health Center, Reba Pleasant, and Janet Tolliver's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, [DN 105], is GRANTED; Defendants Heather Holland, Lindee Monroe, and Rebecca Perry's Motion for Summary Judgment on Remaining Claims, [DN 115], is DENIED AS MOOT; Defendants Rick Burgess, Lincoln Foster, Eddie Frye, and Maureen Leamy's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, [DN 122], is GRANTED IN PART AND DENIED IN PART; and Defendant Susan Redmond-Vaught's Motion to Dismiss for Failure to State a Claim, [DN 124], is GRANTED. The Court will enter a separate Order and Judgment contemporaneous to this Memorandum Opinion.

**Thomas B. Russell, Senior Judge**
**United States District Court**

August 6, 2020

CC: Attorneys of Record